1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                       NORTHERN DISTRICT OF CALIFORNIA

8

9   CHAD RUDOLPHO ANGLE,                        No. C 07-250 SI (pr)

10              Plaintiff,                       **ORDER GRANTING DEFENDANTS'**
                                                 **MOTION FOR SUMMARY**
11      v.                                       **JUDGMENT**

12  ALAMEDA COUNTY
13  MEDICAL CENTER; et al.,

14              Defendant.
                                            /
15

16                              **INTRODUCTION**

17          This action began in state court and was later removed to federal court because claims

18  under 42 U.S.C. § 1983 presented a federal question.  Plaintiff, Chad Angle, initially was

19  represented by counsel but counsel later withdrew from representing him and Angle's efforts to

20  find replacement counsel were unfruitful.  Angle now represents himself from the confines of

21  Atascadero State Hospital, where he is incarcerated as a mentally disordered offender.  There

22  are two groups of defendants in this action:  the mental health defendants and the law

23  enforcement defendants.  Angle's complaint alleges claims based on two basic events.  First, he

24  claims he did not receive adequate psychiatric care from the mental health defendants when he

25  was taken to the John George Psychiatric Pavilion ("JGPP") following his arrest for assaulting

26  two women in Oakland on October 17, 2005.  Second, he claims that, he was subjected to

27  excessive force by the law enforcement defendants at the county jail on October 21, 2005.  The

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   court granted the mental health defendants' motion for judgment on the pleadings on February

2   13, 2008.  This matter is now before the court for consideration of the unopposed motion for

3   summary judgment filed by the law enforcement defendants.  For the reasons discussed herein,

4   the motion will be granted.

5

6                              **BACKGROUND**

7          The remaining defendants are the County of Alameda, Alameda County Sheriff Charles

8   C. Plummer, and Alameda County Sheriff's Deputies Keith Van Dicken, Zahrod Griffin, Vincent

9   Cervelli, Richard Ray, Ryan Peck, Eric Rhienor and Kenneth Braaksma.  The claims remaining

10  for adjudication are a § 1983 claim for excessive force by the deputies, a § 1983 claim against

11  Alameda County and the Alameda County Sheriff for <u>Monell</u> liability, a respondeat superior

12  claim against Alameda County and the Alameda County Sheriff, and a state law claim against

13  the deputies for intentional infliction of emotional distress.  The remaining defendants have

14  moved for summary judgment on the ground that they are entitled to judgment as a matter of law

15  on the four claims in the complaint against them.

16         The following facts are undisputed unless otherwise noted:

17         Chad Angle has a serious mental illness.  He was 31 years old at the time of the incident

18  at the county jail.  When he was 23 years old, he was involuntarily taken to the JGPP, where a

19  doctor told him he had a mental disorder.  When he was 27 or 28 years old, he was diagnosed

20  as being bipolar.  In the five year period before the incident at the county jail, he had been

21  involuntarily committed to JGPP at least two dozen times.  He requires regular doses of

22  medication to control his symptoms, including violent psychotic episodes.

23         On October 17, 2005, Angle was arrested after reportedly attacking two women at a bus

24  stop in Oakland.  He explained at his deposition why he attacked the two women:  "I felt like I

25  was under extreme mental duress and like I had to do something to change what was happening

26  in my life, what was going on.  And for whatever reason I held those people responsible."

27  10/18/07 Angle Depo., RT 37.  He was convicted of aggravated assault and apparently is now

28  in custody serving the sentence for that conviction.  That was his second felony conviction.

2

United States District Court

For the Northern District of California

1    Upon his arrest for the bus stop attack, he was taken to JGPP for evaluation and released

2    a couple of days later, at which time he was taken to the county jail.  In Angle's opinion, he did

3    not receive adequate treatment at JGPP, and that caused his later behavioral problems at the jail.

4    Once he was at the Alameda County Jail, Angle attacked another inmate over a dispute

5    about the television.  Angle attacked the other inmate because that inmate would not let Angle

6    change the channel to watch a football game.

7    On October 21, 2005, at about 6:50 p.m., Angle was transported by bus to the Santa Rita

8    facility of the Alameda County Jail after a court appointment.  He was housed in administrative

9    segregation because he was perceived to pose a danger.  As Angle was being unloaded from the

10    bus, he stepped toward deputy Van Dicken and spit in his face.  Van Dicken was operating with

11    a heightened sense of awareness and concern for his safety because he knew that Angle had been

12    classified as an administrative segregation inmate. Van Dicken provides this undisputed account

13    of the event: "The spit went into my eyes, impairing my vision.  My first thought was that Mr.

14    Angle may have spat in my face to distract me and was going to attack me further.  I

15    instinctively reacted by hitting Mr. Angle in his face with a straight punch with my right hand,

16    striking him on his left cheek.  Mr. Angle lost his balance and fell down the stairs of the bus,

17    landing in the vehicle's sally port."  Van Dicken Decl., ¶ 3.  Van Dicken exited the bus and

18    restrained Angle with the assistance of other deputies.  The other deputies put Angle in restraints

19    while Van Dicken went to the restroom to wash the spit off his face.  Angle stated in his

20    deposition that he was not injured during the spitting incident.

21    After Van Dicken washed his face and returned in a few minutes, he and deputies Cervelli

22    and Rheinor carried Angle to a holding cell.  Angle's hands and feet were restrained, and he was

23    wearing a spit mask.  While being carried, Angle struggled and thrashed his body, trying to kick

24    the escorting officers and break free of their control.  Once Angle was placed in the holding cell,

25    deputy Van Dicken contacted the medical staff to check Angle for injuries.  The vocational nurse

26    told him that there were no visible injuries to Angle, who was running in place in the holding

27    cell for no apparent reason.  The nurse told Van Dicken that Angle had to be moved from the

28    holding cell to the safety cell as a precautionary measure.

3

United States District Court

For the Northern District of California

Less than an hour later, at about 7:30 p.m., deputies arrived to try to move Angle from the holding cell to the safety cell.  During the move, Angle initially was cooperative, but when they arrived at the safety cell and waited for the door to be opened, Angle began breathing very heavily and trying to free his left hand from the grip of deputy Rheinor.  The muscles in Angle's back and arms began to tense up.  Angle was moved into the safety cell and laid prone on the floor after which his clothing and restraints were removed.  (It was standard procedures to remove the clothes of an inmate placed in the safety cell to prevent the inmate from harming himself in the safety cell.  After clothes are removed, the inmate is given a modesty blanket.)

After Angle's clothing was taken and his leg and waist restraints were removed, he became combative.  Angle thrashed about on the floor trying to kick the deputies and trying to free himself from their control.  The deputies ordered Angle at least twenty times not to move, to stop kicking and resisting, and to lie flat on the floor on his stomach.  Angle refused to comply.  The deputies wanted him to lie flat on his stomach to give them time to leave the cell before he could get up and attack them again.  Angle was sweating profusely as he continued kicking the deputies and rolling from side to side.  Because he was naked, sweaty and thrashing about, it was more difficult for deputies to physically control him.  When a deputy would loosen his grip, Angle's thrashing and kicking would escalate; this made deputies perceive it to be unsafe to let go of him and leave the cell.

At one point in the struggle, Angle freed his left arm from deputy Peck's grip and grabbed Peck's left leg.  Angle tried to pull the deputy down to the ground and then tried to bite his leg.  Deputy Peck yelled for assistance.  He then tried pulling his foot away and dropping to his knees to get Angle to release his grip on his leg, but that did not succeed.  Deputy Peck then delivered a knee strike to Angle's torso to try to get Angle to release him.  Angle continued to hold onto Peck's leg and appeared unfazed by the knee strike.  He continued thrashing and kicking at the deputies.  Deputy Peck delivered another knee strike to Angle's torso, but Angle did not release his grip on Peck's leg.

Angle continued to thrash about and tried to get off the ground and on to his feet, contrary to the orders to lie flat on his stomach.  Deputy Rheinor punched Angle three times in the torso

4

United States District Court

For the Northern District of California

to try to get him to stop attacking the deputies. Like deputy Peck's knee strikes, these punches had no effect on Angle, who continued to kick and strike at the deputies. To the deputies, Angle seemed impervious to the pain.

Due to Angle's continued struggling, the deputies decided to put him back into restraints. Once Angle was returned to leg and waist restraints, the deputies were able to safely exit the cell. Angle stated that he suffered a broken jaw and other head injuries due to the incidents at the jail.

During his deposition, Angle made numerous statements harmful to his claims. He admitted that he did not comply with orders to stop resisting and to lie flat on the ground. He explained: "when I get into situations where I feel disrespected, there usually is – something violent occurs." 10/18/07 Angle Depo., RT 77. He stated that a deputy merely using the wrong tone would amount to disrespect toward him and lead him to resist, and that is how he felt on October 21 in the safety cell. He admitted he had no evidence to prove his claims against the county or sheriff Plummer, e.g., no evidence of other instances of excessive force, no evidence of a pattern or practice of constitutional violations by deputies, no evidence of deliberate indifference, and no evidence of a failure to take adequate measures to prevent any pattern of misconduct by deputies. Angle did not respond to defendants' requests for admissions, and therefore is deemed to have admitted all the assertions in the requests, which completely undermines any ability to prove his case.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred in Alameda County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. §§ 1331, 1441(b), (c).

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, when a party challenges the merits of the opponent's claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  The complaint was not made under penalty of perjury and therefore is not considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  Id. at 631.

**United States District Court**
For the Northern District of California

1
**DISCUSSION**

2
A.    Excessive Force Claim

3          The Due Process Clause of the Fourteenth Amendment protects a post-arraignment

4   pretrial detainee from the use of force that amounts to punishment. <u>Graham v. Connor</u>, 490 U.S.

5   386, 395 n.10 (1989) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535-39 (1979)).  If a particular

6   condition or restriction of pretrial detention is reasonably related to a legitimate governmental

7   objective, it does not, without more, amount to "punishment."  <u>Bell</u>, 441 U.S. at 539.  For

8   example, states must be able to take steps to maintain security and order at pretrial facilities, and

9   restraints that are reasonably related to a facility's interest in maintaining jail security are not,

10  without more, unconstitutional punishment.  <u>See id.</u> at 540.

11         For convicted prisoners, to whom the Eighth Amendment applies, the Supreme Court has

12  held that whenever prison officials stand accused of using excessive physical force, "the core

13  judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore

14  discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7

15  (1992).  In determining whether the use of force was for the purpose of maintaining or restoring

16  discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the

17  need for application of force, the relationship between that need and the amount of force used,

18  the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and

19  any efforts made to temper the severity of a forceful response. <u>Id.</u> at 7. It is not necessary that

20  a prisoner have suffered significant injury in order to prevail on an Eighth Amendment claim for

21  use of excessive force, but the Eighth Amendment necessarily excludes from constitutional

22  recognition de minimis uses of force, provided that the use of force is not of a sort repugnant to

23  the conscience of mankind. <u>Id.</u> 9-10.   Although a prisoner may believe that his rights were

24  violated, "not every push or shove . . . violates [his] constitutional rights."  <u>Id.</u> at 9 (citation

25  omitted).

26         Several circuits have held that the <u>Hudson</u> analysis also applies to excessive force claims

27  brought by pretrial detainees under the Fourteenth Amendment. <u>See</u> <u>United States v. Walsh</u>, 194

28  F.3d 37, 48 (2d Cir. 1999); <u>Riley v. Dorton</u>, 115 F.3d 1159, 1167 (4th Cir.), <u>cert. denied</u>, 522

U.S. 1030 (1997).  Although the Ninth Circuit has not addressed the issue, it has routinely used the Eighth Amendment as a benchmark for evaluating claims brought by pretrial detainees.  See, e.g., Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc), cert. denied, 502 U.S. 1074 (1992) (pretrial detainee alleging due process violation when attacked by other inmates must show deliberate indifference to personal security as would a prisoner bringing such claim under 8th Amendment).

Angle has failed to show a triable issue of fact on his claim that the defendant deputies used excessive force on him on October 21, 2005.  Angle did not oppose the motion for summary judgment, although the court imposed a deadline that allowed him two months to prepare his opposition and waited an additional month after that deadline to see if anything would be filed.  It was not.  Angle's complaint was not verified, so it may not be considered as evidence in opposition to defendants' motion.  There thus is no evidence from Angle and the defendants' evidence is uncontroverted.

On the undisputed evidence, defendants are entitled to judgment as a matter of law on the excessive force claim.  Under the circumstances that presented themselves to the defendant deputies, hitting Angle did not amount to excessive force.  Deputy Van Dicken hit Angle once in the face after Angle moved toward him and spit in his face and eyes.  The evidence is undisputed that, at the time he hit Angle, deputy Van Dicken thought that Angle may have spat in his face to distract him and intended to attack him further.  The spitting was unprovoked.  The evidence indicates this was a quick exchange; once Van Dicken hit Angle, and Angle fell down the stairs, Van Dicken did not continue to hit him.

As to the incident in the safety cell, the defendants' argument is much stronger, and their entitlement to judgment as a matter of law is much clearer.  Hitting the violent and combative inmate was done for the purpose of restoring order rather than for the malicious and sadistic purpose of causing harm.  There was a need for force, as Angle was indisputably resisting the deputy's efforts to restrain him, trying to kick them, trying to break free from them, and trying to bite one deputy's leg.  The amount of force used was reasonable in relation to the need, as there was a violent struggling inmate who refused to comply with orders.  The deputies were in

United States District Court
For the Northern District of California

close contact with him and could not attempt to back away from Angle and exit the cell until Angle was subdued or voluntarily ceased struggling – and he refused to do the latter.  As to the injuries suffered, the evidence is weak: Angle stated at his deposition that he suffered various head injuries, including a broken jaw, but provided no medical records in support of his assertion and provided no evidence that the injuries stemmed from any particular defendant's actions as opposed to his violent efforts to resist the deputies.  See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (allegations of injury without medical records or other evidence of injury insufficient to establish excessive force claim under 4th Amendment).  The undisputed evidence is that the deputies perceived the violently struggling inmate to pose a threat, such that they could not extricate themselves from the cell safely.  The deputies attempted to temper the severity of their response by giving Angle numerous oral commands to stop fighting and lie on his stomach before using force on him.  The deputies thought the force used appeared to have little effect in subduing Angle, as he seemed impervious to pain and did not stop resisting.  The steps taken to restrain the violently defiant inmate were reasonably related to the jail's interest in maintaining jail security.  On the evidence in the record, no reasonable jury could conclude that the deputies' use of force on Angle was malicious and sadistic or amounted to punishment prohibited by the Fourteenth Amendment.  The deputy defendants are entitled to judgment as a matter of law on Angle's Fourteenth Amendment claim.

The deputy defendants also are entitled to qualified immunity against the Fourteenth Amendment claim.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The first prong is a threshold question; "if no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified

United States District Court

For the Northern District of California

1  immunity." <u>Id.</u>  Angle's claim falters on the first prong because there was not a constitutional

2  violation.  Even assuming arguendo that there was a violation of his constitutional rights, Angle's

3  claim would fail on the second prong.  The qualified immunity inquiry is deferential to the

4  government official; "[t]he scenario may look different when gauged against the '20/20 vision

5  of hindsight,' but [a court] must look at the situation as a reasonable officer in [the deputy's]

6  position could have perceived it." <u>Marquez v. Gutierrez</u>, 322 F.3d 689, 693 (9th Cir.), <u>cert.</u>

7  <u>denied</u>, 540 U.S. 1073 (2003).  As to the spitting incident, the evidence is undisputed that Angle

8  had spit in deputy Van Dicken's face without provocation and Van Dicken was concerned there

9  would be a further attack.  As to the safety cell incident, the evidence is undisputed that Angle

10  violently struggled to hurt and resist the deputies when he was put in the safety cell.  Under these

11  undisputed facts, it would not have been clear to a reasonable officer that it was unlawful to use

12  knee strikes and punches to subdue the inmate.  The deputies are entitled to qualified immunity

13  as a matter of law.

14

15  B.      <u>Intentional Infliction Of Emotional Distress Claim</u>

16          The elements of California's tort of intentional infliction of emotional distress are

17  "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless

18  disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

19  extreme emotional distress; (3) and actual and proximate causation of the emotional distress by

20  the defendant's outrageous conduct." <u>Cervantez v. J.C. Penney Co., Inc.</u>, 24 Cal. 3d 579, 593

21  (1979).  Defendants are entitled to judgment as a matter of law on this claim because plaintiff

22  has provided no evidence in support of any of the elements of the claim.  On the undisputed

23  evidence, no reasonable jury could find in Angle's favor on this claim.

24

25  C.      <u>Claims Against County And Sheriff</u>

26          Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where

27  official policy or custom causes a constitutional tort, <u>see</u> <u>Monell v. Dep't of Social Servs.</u>, 436

28  U.S. 658, 690 (1978); however, a municipality may not be held vicariously liable for the

United States District Court

For the Northern District of California

1   unconstitutional acts of its employees under the theory of respondeat superior, <u>see</u> <u>Board of</u>

2   <u>County Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997); <u>Monell</u>, 436 U.S. at 691.  To impose

3   municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show:

4   (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the

5   municipality had a policy; (3) that the policy amounted to deliberate indifference to the plaintiff's

6   constitutional rights; and (4) that the policy was the moving force behind the constitutional

7   violation.  <u>See</u> <u>Plumeau v. School Dist. #40 County of Yamhill</u>, 130 F.3d 432, 438 (9th Cir.

8   1997).

9        A municipality may be liable for constitutional violations resulting from its failure to train

10  its workers where the inadequacy of the training amounts to deliberate indifference to the rights

11  of the people with whom the municipality comes into contact.  <u>See</u> <u>City of Canton v. Harris</u>, 489

12  U.S. 378, 388 (1989); <u>Van Ort v. Estate of Stanewich</u>, 92 F.3d 831, 835 (9th Cir. 1996), <u>cert.</u>

13  <u>denied</u>, 519 U.S. 1111 (1997); <u>Mackinney v. Nielsen</u>, 69 F.3d 1002, 1010 (9th Cir. 1995).  Only

14  where a failure to train reflects a "'deliberate' or 'conscious' choice" by a municipality can it be

15  thought of as a municipality's policy or custom that can support liability under § 1983.  <u>See</u>

16  <u>Harris</u>, 489 U.S. at 389.  It is not enough to simply say that a training program represents a

17  policy for which the municipality is responsible.

18       That much may be true.  The issue in a case like this one, however, is whether that
         training program is adequate; and if it is not, the question becomes whether such
19       inadequate training can justifiably be said to represent "city policy."  It may seem
         contrary to common sense to assert that a municipality will actually have a policy of not
20       taking reasonable steps to train its employees.  But it may happen that in light of the
         duties assigned to specific officers or employees the need for more or different training
21       is so obvious, and the inadequacy so likely to result in the violation of constitutional
         rights, that the policymakers of the city can reasonably be said to have been deliberately
22       indifferent to the need.  In that event, the failure to provide proper training may fairly be
         said to represent a policy for which the city is responsible, and for which the city may be
23       held liable if it actually causes injury.

24  <u>Id.</u> at 389-90.  The appropriate inquiry on the causation issue is whether the injury would have

25  been avoided "had the employee been trained under a program that was not deficient in the

26  identified respect."  <u>Id.</u> at 391.  But-for causation is not enough; "[r]ather, the policy must be the

27  proximate cause of the section 1983 injury."  <u>Van Ort</u>, 92 F.3d at 837.  As in traditional tort

28

cases, an intervening cause may break the chain of proximate causation in a § 1983 action. <u>See</u> <u>id.</u> (defendant's unforeseeable private acts defeated proximate cause connecting county's alleged negligence to plaintiffs' injuries).  Rigorous standards of culpability and causation must be applied to ensure that a municipality will not be held liable solely for the actions of its employee on a prohibited respondeat superior theory. <u>See</u> <u>Board of County Comm'rs v. Brown</u>, 520 U.S. at 405.

The starting point here is to note the limited nature of the liability question.  Alameda County and its Sheriff cannot be held liable merely because they employed the other defendants -- that would be impermissible respondeat superior liability.  <u>See</u> <u>Monell</u>, 436 U.S. at 694. Because there is no potential for respondeat superior liability, the County and Sheriff can avoid liability even if their employees engaged in unconstitutional behavior if the municipal entities can show they were not liable on a policy or failure-to-train theory.

Angle fails to produce evidence sufficient to raise a triable issue of fact on his <u>Monell</u> claim.  No reasonable jury could conclude that the County or Sheriff had a policy that amounted to deliberate indifference to Angle's constitutional rights and was the moving force behind a violation of his constitutional rights.  The County and Sheriff have identified the portions of the record which demonstrate the absence of a genuine issue of material fact that there was a policy that amounted to deliberate indifference to Angle's constitutional rights and that the policy was the moving force behind the alleged constitutional violation.  Angle does not meet his burden to designate specific facts showing that there is a genuine issue for trial on these essential elements of his claim.  The County and the Sheriff are entitled to judgment as a matter of law.

/   /   /

/   /   /

United States District Court<br>For the Northern District of California

12

United States District Court

For the Northern District of California

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED.  (Docket # 96.)  Now that the claims against both the law enforcement defendants and the medical defendants have been adjudicated in favor of the defendants, judgment will be entered in all defendants' favor and against plaintiff.  The clerk will close the file.

IT IS SO ORDERED.

Dated: November 17, 2008

SUSAN ILLSTON
United States District Judge